UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

KEVIN KALLOO, SHAHRAAZ MOHAMMED,
and CLEMENT ALBERTIE, individually, and on
behalf of all others employed by ULIMITED
MECHANICAL CO. OF NY, INC., and any other
entities affiliated with, controlling, or controlled by
UNLIMITED MECHANICAL CO. OF NY, INC.,

                                        Plaintiffs,

          - against -

UNLIMITED MECHANICAL CO. OF NY, INC.,
and any other entities affiliated with, controlling, or
controlled by UNLIMITED MECHANICAL CO.
OF NY, INC., and NICHOLAS BOURNIAS,
individually,

                                        Defendants.

------------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 10 2013 ★

BROOKLYN OFFICE

OPINION

No. 11-cv-6215 (NG) (RLM)

**GERSHON, United States District Judge:**

Plaintiffs Kevin Kalloo, Shahrazz Mohammad, and Clement Albertie sue defendants

Unlimited Mechanical Co. of New York, Inc. ("Unlimited Mechanical") and Nicholas Bournias

for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New

York Labor Law ("NYLL"), §§ 190 *et seq.*  Specifically, plaintiffs allege that defendants failed

to pay them appropriate overtime compensation for hours worked under the FLSA and NYLL.

Plaintiffs also allege that defendants failed to pay compensable travel time under the statutes, and

that defendants, in violation of the NYLL, failed to pay Mr. Kalloo for his last two weeks of

work at Unlimited Mechanical.  Defendants bring counterclaims against Mr. Albertie for unjust

enrichment, and against Mr. Kalloo for interference with contractual or business relations.

A bench trial was held on September 18, 20, and 23, 2013.[1] Plaintiffs testified on their own behalves, along with Izabela Gardocka, a paralegal who prepared documents summarizing plaintiffs' timesheets and reflecting their damages' requests. Plaintiffs also called defendant Nicholas Bournias, who was examined by defense counsel solely as to his testimony on plaintiffs' case. As stated on the record, defense counsel limited his examination of Mr. Bournias to cross-examination on the testimony elicited by plaintiffs. Michael Mavromoustakos, Fidel Martinez, Manuel Pena, Mauricio Nolasco, and Maria Askordalakis, all current employees of Unlimited Mechanical, testified in the defense case, and Waldo Hatch and Robert Miller testified on the counterclaims.

## FINDINGS OF FACT

The court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1) are set forth below and also in the later sections of this Opinion. These findings are drawn from witness testimony at trial, my careful observation of the witnesses' demeanor and candor, the parties' trial exhibits, and the stipulated facts read into the record at trial.

### A. Unlimited Mechanical and Mr. Bournias

Unlimited Mechanical, which is located in Long Island City, provides installation, servicing, and maintenance for HVAC systems. Mr. Bournias, Unlimited Mechanical's president, owns fifty percent of the company, and Michael Mavromoustakos, its vice-president, owns the other half.

Mr. Bournias oversaw the work of Unlimited Mechanical, directed its employees on a daily basis, set workers' schedules, determined rates of pay, visited job sites, made deliveries, and performed most of the hiring and firing. He supervised the three plaintiffs, monitored their

---

[1] This case was conditionally certified as a collective action under the FLSA. Only the claims of the three plaintiffs, who were named in the original complaint, proceeded to trial.

hours worked, reviewed their payroll, and told them when and where to work. Mr. Bournias signed workers' paychecks and approved their overtime hours. Mr. Mavromoustakos focused on "running the sheet metal shop, estimating, helping run the construction jobs and whatever else the company need[ed] . . . ." Trial Tr. 395.

Unlimited Mechanical employed the plaintiffs. (The dispute as to whether Mr. Kalloo was an employee or independent contractor is discussed below.) Plaintiffs were directed to wear Unlimited Mechanical shirts, sweaters, and hats when they were on the job, and Unlimited Mechanical provided them with equipment, trucks, and materials to do their work.

### B. The Payment of Straight Time and Overtime

A standard workday at Unlimited Mechanical was eight hours plus a thirty minute unpaid lunch break. Payments for these hours (*i.e.*, the first forty hours of a work week, or "straight time") were made by check. Unlimited Mechanical rarely "allowed" for overtime (*i.e.*, work in excess of forty hours per week), and customers rarely paid for it. When plaintiffs were paid for working more than forty hours in a week, the overtime payments were made in cash, and defendants kept no written record of the cash payments.

Unlimited Mechanical required employees to fill out their own timesheets, which they would then submit to the company in order to receive their paychecks. The timesheets contained columns for each day of the week. Each day contained boxes for an employee to enter the date, "time in," "time out," overtime hours, and total hours.[2] The timesheets also contained lines for the total regular hours for the week and the total overtime hours for the week, the employee's signature, and the manager's signature. After entering their information, employees would

---

[2] Mr. Kalloo's timesheets also included a row for "location," although the row was rarely filled in.

3

submit the timesheets to Mr. Bournias for his approval. Mr. Bournias would review the timesheets and make adjustments.

These adjustments were made in Mr. Bournias's sole discretion: employees had no opportunity to review the adjustments, which were made after they submitted their timesheets, and Mr. Bournias sometimes based his adjustments on his impression that plaintiffs had wasted time on the job or had made a mistake in entering their time. Moreover, Unlimited Mechanical kept no records to compare against the employees' entries. The sole evidence of a "record" was a reference to a blotter on Mr. Bournias's desk, which was never produced in this case, that tracked only vacation and sick days.

Mr. Bournias, and not Ms. Askordalakis, the company's bookkeeper and Mr. Bournias's sister, calculated the overtime. He would then give her a slip of paper with the amount of additional cash owed to an employee, but the paper did not contain the number of overtime hours that the employee had worked. The bookkeeper would discard the paper as soon as she was finished with it. Neither Mr. Bournias nor Unlimited Mechanical withheld taxes from these cash overtime payments, or paid withholding taxes to the Internal Revenue Service or New York State. Mr. Bournias testified that Unlimited Mechanical paid overtime wages at a time and a half rate, but acknowledged that Unlimited Mechanical had no records to corroborate the assertion.

Based upon all of the evidence, including the evidence discussed below, I conclude that Unlimited Mechanical failed to pay plaintiffs the full amount of their earned overtime wages, when wages for overtime hours were paid at all. Mr. Bournias's and Mr. Mavromoustakos's testimony to the contrary is not credited. Insofar as current employees testified that they themselves received time and a half pay when working overtime, this testimony was not persuasive with respect to the payments that the plaintiffs received.

4

## C. Clement Albertie

Mr. Albertie seeks damages under the NYLL for overtime work he performed, as reflected on the "time in" and "time out" entries on his timesheet, for which he was not compensated with overtime wages. He also seeks damages under the NYLL for uncompensated travel time back to Unlimited Mechanical's shop at the end of the work day; depending on the number of hours he worked in the week, he asserts he was entitled to either straight time or overtime wages.

Mr. Albertie is an HVAC mechanic with approximately fourteen years of experience in installing, servicing, maintenance, and ductwork. Unlimited Mechanical employed Mr. Albertie between March 24, 2007 and August 24, 2008, and he was paid $24 per hour. He was initially employed as a junior mechanic, and he became a mechanic approximately three months after he began at Unlimited Mechanical. He mostly worked at job sites away from the shop, although he would occasionally work at the shop after regular hours.

Mr. Albertie worked more than forty hours nearly every week. About half of the time that he worked more than forty hours per week Unlimited Mechanical would pay him for those additional hours. When he was paid for the additional hours, he was paid at his regular hourly rate, and the rest of the time he received no additional payment.

He typically began and ended his workday at the shop, usually arriving around 7 a.m., although on occasion he would arrive earlier if Mr. Bournias told him to do so. He started his work day there because he had to get the company truck, which, unlike other workers, he could not park overnight near his home. When he arrived at the shop, he would prepare the materials and organize the equipment he needed for the day, and he would leave for the job site once he

5

had the necessary paperwork. Most days he would leave the shop around 7:30 a.m.,[3] and leave the job site at 4:00 or 4:30 p.m. to return to the shop, drop off his paperwork, and get his car.

Mr. Bournias and Mr. Mavromoustakos acknowledged that Mr. Albertie usually began and ended his day at the shop. Mr. Mavromoustakos testified that Mr. Albertie was paid from "[t]he moment he came to the shop [in the morning] until the moment he dropped off the truck at the shop [in the evening]." Trial Tr. 393. This testimony rings hollow considering that every single timesheet of Mr. Albertie's reflects that his work ended either on the hour or half hour. (The times indicated on the other plaintiffs' timesheets are similar to Mr. Albertie's in that regard.) Mr. Mavromoustakos also testified that Unlimited Mechanical trusted what the employees put on the timesheets, which conflicts with Ms. Askordalakis's testimony that Mr. Bournias would review the timesheets and make adjustments.[4]

Mr. Albertie worked in New York City most of the time. On occasion, it would take him up to two and a half or three hours to return to the shop from a job, especially if the job site was in Staten Island or southern Brooklyn. Approximately fifteen percent of his work was at job sites outside of the five boroughs.

Mr. Albertie would enter the dates he worked, along with his time in and time out, on his timesheets. This time reflected the time spent traveling in the morning and time spent at the job site. At times, he would tally the total hours before signing the timesheet. Mr. Bournias told him what numbers to enter. Mr. Albertie did not indicate travel time spent returning to the shop on

---

[3] Plaintiffs acknowledge that they were paid for their travel time in the morning and that time spent commuting to and from work is not compensable.

[4] As discussed in the text, plaintiffs' timesheets do not always reflect accurately the hours worked by plaintiffs. Nevertheless, plaintiffs limit their request for damages to the times reflected on the timesheets, with the exception of travel time and Mr. Kalloo's hours during his last two weeks, which do not appear on any timesheet.

his timesheet because Mr. Bournias told him not to do so, and he believed he was not paid for travel time spent returning to the shop. After signing the timesheet, he would put it in a dropbox at the office. Mr. Bournias signed the timesheet after he submitted it, but he never told Mr. Albertie that the timesheets were being altered. Mr. Albertie believed he could not question the amount of payment he received, and he signed his timesheets in order to collect his paychecks, notwithstanding that they did not reflect his actual hours worked. Based upon the credible evidence, I find that Mr. Albertie was not paid his full overtime wages for the overtime hours that he worked, and that he was not compensated for time spent returning to the shop at the end of the work day.

### D. Kevin Kalloo

Mr. Kalloo seeks damages under the FLSA for overtime work he performed, as reflected on the "time in" and "time out" entries on his timesheet, for which he was not compensated with overtime wages. He also seeks damages under the FLSA for uncompensated travel time back to Unlimited Mechanical's shop at the end of his work day when it resulted in compensable overtime, and under the NYLL when it resulted in straight time. He also seeks damages under the NYLL for unpaid wages for his last two weeks of work at Unlimited Mechanical.

Mr. Kalloo worked as an HVAC mechanic for Unlimited Mechanical between December 14, 2009 and November 2, 2011. He earned $25 per hour. Mr. Kalloo received a 1099 form from Unlimited Mechanical for federal income tax purposes. He did not ask to receive a 1099 instead of a W-2, and he did not know why he received one. Although Mr. Mavromoustakos testified that Mr. Kalloo asked to receive a 1099 form, he agreed that Mr. Kalloo was an "employee" of Unlimited Mechanical. As noted above, Mr. Bournias hired Mr. Kalloo and directed his work.

7

"Most times" Mr. Kalloo worked more than forty hours in a week for Unlimited Mechanical. His timesheets corroborate that he frequently worked more than forty hours per week. Although Unlimited Mechanical generally paid him for the hours over forty worked—albeit at his straight time rate—"every few weeks" Unlimited Mechanical would not pay for those hours at all. Mr. Kalloo approximated that, in the weeks when he worked more than forty hours, fifty to sixty percent of the time he was paid at his straight time rate, and the rest of the time he received no pay for his excess hours.

Typically—at least initially—Mr. Kalloo started his work day at the shop in Long Island City, and he would go directly to the job site only "once in a few months." At the shop, he would receive instructions regarding the day's work from Mr. Bournias or pick up specific tools or materials as necessary. Approximately fifty percent of the time Mr. Kalloo returned to the shop at the end of the day to drop off paperwork to Mr. Bournias and discuss the work he had performed that day. For the last three months of his job, however, he would be picked up at his house or elsewhere *en route* to the job site, and be dropped off at his house or elsewhere in the evening. In light of the totality of the evidence, Mr. Kalloo's testimony on this point was more plausible and credible than the testimony of Mr. Mavromoustakos.

The vast majority of Mr. Kalloo's work took place in Nassau and Suffolk counties, particularly in the second year of his employment. For a handful of days, though, he worked as close as a few blocks away from the shop in Long Island City. On average, it took him approximately one hour to return to the shop at the end of the work day. Mr. Kalloo did not drive, and Unlimited Mechanical had to hire a helper to drive him.

Mr. Kalloo filled out his timesheets by entering the dates he worked, the time he began and ended the day, his overtime hours, and the total hours for the day. Mr. Bournias told him

8

what times to mark on the timesheets, and those times did not accurately reflect the amount of time he worked each day. When he started, Mr. Kalloo's timesheets would be returned to him to "redo . . . the way [Mr. Bournias] wanted it to get done. . . . He just wanted the straight eight hours, make it eight hours, 7:30 to 4:30, make it simple for him." Trial Tr. 147. "[Mr. Bournias] wanted eight hours and he got eight hours." Trial Tr. 184. Mr. Kalloo stated credibly, "I would actually get to the shop before 7:30 and most times I would actually stop working after 4:30." Trial Tr. 146.

Nor did the timesheets include his travel time back to the shop. Mr. Bournias told Mr. Kalloo, "I'm not paying you guys for travel time." Trial Tr. 147. Mr. Kalloo had to redo his timesheet at Mr. Bournias's direction several times. On those occasions, Mr. Bournias would say that Mr. Kalloo had wasted time on the job or had made a mistake on the timesheet.

Mr. Kalloo kept a contemporaneous diary of his time records from Unlimited Mechanical, although he occasionally made minor entries or corrections after the fact, too. Mr. Kalloo used it to track his hours worked and ensure that he was paid for his time. He did not include travel time in his diary because he knew that he would not be paid for it in any event.

Manuel Pena and Fidel Martinez, both of whom are currently employed by Unlimited Mechanical, testified for the defense that they had served as Mr. Kalloo's drivers. These witnesses testified that they "very rarely" picked up Mr. Kalloo at the shop, but instead generally picked him up at a location convenient to him. The testimony of these witnesses is not credited insofar as it contradicted that of Mr. Kalloo. Notably, these current employees testified that Unlimited Mechanical's work day is eight hours long, no matter what time it started. For example, Manuel Pena testified that he would work eight hours, and then stop and go home. At the same time, he testified that he was paid for travel time when he was asked to go back to the

9

shop and for dropping off Mr. Kalloo every day. Nevertheless, he stated that he rarely worked overtime. In addition, these witnesses did not have any personal knowledge of the amounts the plaintiffs were paid or how plaintiffs were instructed to fill out their timesheets. The testimony of Mauricio Nolasco, another current employee who testified only about his own work, was largely irrelevant. Based on all the credible evidence, I find that Mr. Kalloo did not receive his full overtime compensation for the overtime hours that he worked, and that he was not paid for his travel time when returning to the shop.

It is undisputed that Mr. Kalloo was not paid for the last two weeks that he worked for Unlimited Mechanical. In those last two weeks, he worked forty hours during the first week and sixteen hours during the second.

### E. Shahrazz Mohammad

Like Mr. Albertie, Mr. Mohammad seeks damages under the NYLL for overtime work he performed for which he was not compensated with overtime wages, and for uncompensated travel time back to Unlimited Mechanical's shop at the end of the work day.

Mr. Mohammad worked as a plumber and junior mechanic at Unlimited Mechanical on HVAC installations. Mr. Mohammad was paid $15 per hour for his first six months on the job, with a raise to $18 per hour for the rest of his employment.

Unlimited Mechanical employed Mr. Mohammad between May 26, 2007 and October 19, 2007. The parties hotly dispute, however, whether Unlimited Mechanical also employed him through June 1, 2008.[5]

---

[5] At oral argument on September 30, 2013, plaintiffs withdrew their earlier claim that Mr. Mohammad also worked for Unlimited Mechanical in 2006. Although some evidence exists to suggest that Mr. Mohammad worked for defendants for a short time beyond June 1, 2008, plaintiffs have limited their damages' request to that date.

Based on all of the evidence, Mr. Mohammad's testimony that Unlimited Mechanical and Mr. Bournias employed him during the latter part of 2007 and into 2008 is credited. Mr. Mohammad testified that he could not remember when he began working for Unlimited Mechanical, but he believed he worked for them for "two, two and a half years." Mr. Mohammad testified that he performed the same work throughout this period, continued to report to Unlimited Mechanical's shop, wore Unlimited Mechanical's uniform, used Unlimited Mechanical's trucks, equipment, and materials, and was paid by, reported to, and took direction from, Mr. Bournias, Mr. Mavromoustakos, and Jimmy Agnostis. He was initially hired by these individuals, and kept working for them throughout 2007 and 2008. Mr. Bournias and Mr. Mavromoustakos were responsible for his pay raise to $18 per hour.

The parties agree that Mr. Mohammad received a W-2 from Unlimited Mechanical in 2007 in the amount of $11,692.50, which is approximately the same amount that he earned as reflected on his pay stubs from this period. Mr. Mohammad's undisputed testimony established that Mr. Bournias gave him a W-2 form from "Unlimited Mechanical" in 2008 in the amount of $21,756. The 2008 W-2 produced by Mr. Mohammad reflects that Mr. Mohammad's employer in 2008 was "Unlimited Mechanical Plumbing & H," located at the same address as that of defendant Unlimited Mechanical Co. of New York but indicating a different tax identification number.

In addition to Mr. Mohammad's uncontested testimony that he continued to work for, and be paid by, Mr. Bournias, defendants admitted in their Answer that Mr. Mohammad worked for Unlimited Mechanical doing "plumbing and pipefitting" between March 2007 and August 2008.[6]

---

[6] There is no sound reason to accept defense counsel's argument that this admission was a "typo;" defendants never sought to amend the Answer or correct the admission prior to trial, despite plaintiffs indicating their position in the Joint Pre-Trial Order that Unlimited Mechanical

In the face of this admission, the defendants' failure to produce time sheets or paystubs for this period is troubling. For all of these reasons, plaintiffs' evidence that Mr. Mohammad worked for Unlimited Mechanical Co. of New York and Mr. Bournias from May 26, 2007 until June 1, 2008 is persuasive.[7]

Mr. Mohammad regularly reported for work at the Long Island City shop at 7:00 or 7:30 a.m. as directed. He would load the truck and get his daily work orders, and would occasionally drive the truck to the job site. He would typically return to the shop on three or four days per week, at the direction of Mr. Bournias or Mr. Mavromoustakos, to return paperwork, unload and clean the truck, and report on the work that was completed that day.

He testified that he worked in excess of forty hours per week approximately two or three weeks per month. He also testified that the hours on the timesheets generally reflected the hours he worked, although his travel time was never reflected on the timesheets. He "put down the time they told us to record on the timesheet." Trial Tr. 99. He testified that he was paid at his straight time rate for hours worked in excess of forty and he did not receive his overtime rate. Any inconsistencies in his deposition testimony—assuming there are any—do not change my

employed Mr. Mohammad continuously through June 1, 2008. Indeed, defendants specifically incorporated "all the allegations asserted in the Answer" in the Joint Pre-Trial Order.

[7] In a post-trial memorandum, defendants argue that Mr. Mohammad in fact worked for the company named Unlimited Mechanical Plumbing and Heating in 2008. They rely on the W-2 offered by Mr. Mohammad, but the totality of the evidence does not support their conclusion. Mr. Mavromoustakos and Ms. Askordalakis testified only that Mr. Mohammad did not work for Unlimited Mechanical Co. of New York during 2008. They did not directly refute Mr. Mohammad's testimony that the two companies were "joined together," that he performed the same work in the same manner for the same people through 2007 and 2008, and that he was never hired by a different company. Nor did they dispute that Mr. Bournias handed him a W-2 form from a business located at the same address, as noted above. The reason that Mr. Mohammad was given a W-2 form bearing a somewhat different company name was never explained, but it cannot serve to defeat the evidence supporting his claims against the defendants in this case.

finding that this unsophisticated worker was essentially telling the truth as he understood it at trial regarding his work hours and pay.

While Mr. Mohammad's travel time ranged from anywhere between thirty minutes and two and a half hours, he testified that his daily average travel time was approximately one hour. He mostly worked on "city buildings" in Harlem. For approximately two weeks, however, he worked at "the Verizon building," and, while he could not remember the name of the town in which the building was located, he stated that it was approximately two to two and a half hours north of New York City on Interstate 87. As Mr. Mavromoustakos agreed, Mr. Mohammad worked in the shop "framing sheetrock" for a period of time; although neither he nor Mr. Mavromoustakos knew precisely the amount of time he did so, two months is a reasonable estimate based on the testimony.

Mr. Mohammad filled out his own timesheets, entering the dates and his daily time in and time out. He tallied his total straight work hours for the week, but did not tally his overtime. He entered as his "time in" the time that he started work, but he was directed by Mr. Bournias as to what time to enter as his "time out." Like the other plaintiffs, he had to sign his timesheet in order to get paid. Although the only timesheets in evidence pertaining to Mr. Mohammad date to the period between May 2007 and October 2007, he testified that he worked similar hours throughout the rest of 2007 and 2008 as well, and that testimony is credited. All the credible evidence leads me to conclude that Mr. Mohammad was not fully compensated for the overtime hours that he worked, nor for his travel time back to the shop at the end of the work day.

**F. Evidence of Damages**

Plaintiffs introduced spreadsheets summarizing their timesheets and paystubs in support of their claims for damages through the testimony of Izabela Gardocka, the paralegal who prepared them. This witness provided testimony regarding the preparation of the summary chart

pursuant to Federal Rule of Evidence 1006; she was not, as defendants characterize her, a damages expert. The spreadsheets included, among other things, calculations that totaled the number of hours worked in any given week based on the "time in" and "time out" represented on the timesheets, wages earned but not paid, and the unpaid wages for travel time based on an average hour of travel time per day. Insofar as the spreadsheets include travel time hours not listed on the timesheets, she did not determine those hours herself but based her calculations on counsel's descriptions of plaintiffs' anticipated testimony and the timesheets themselves. No expert analysis was involved. The entries on the spreadsheet were transparent, and the calculations were made by a computer program. Defense counsel went over the summary chart in detail and pointed out some immaterial irregularities on the spreadsheets, such as the computer program rounding numbers based on column width, but did not elicit any testimony that called into doubt the substantial accuracy of the entries. Moreover, I observed the witness's candor in explaining how she entered the data with care and conscientiousness. Specific figures from the chart are discussed below in the Calculation of Damages section.

### G. Counterclaims

#### 1. Alleged Theft of Copper Pipe from Teachers College

Defendants allege in a counterclaim that Mr. Albertie improperly removed copper piping from a job site at Teachers College and sold it for scrap, which cost them approximately $15,000 to replace.

Mr. Albertie told Mr. Bournias that the existing but unused copper piping needed to be removed in order to access the space where the new lines would be installed. Mr. Albertie was the lead worker on the job, and he reviewed the job plans, but the plans did not specify whether the pipes should be removed. He asked Mr. Bournias for permission to remove the lines because

he wanted to use the area to run new lines. Mr. Bournias came to the site the next day and granted him permission. Mr. Albertie took the discarded piping back to the shop at the end of the day and put it in the dumpster.[8] Mr. Bournias called Mr. Albertie to his office a day or two later to tell him that the pipe should not have been removed. Mr. Albertie testified that he said to Mr. Bournias, "You told me to take it out. . . . Nick told me that the engineer over there told [Mr. Bournias] that he should have left this pipe . . . ." Mr. Albertie told Mr. Bournias,"This is on you, sir," because Mr. Bournias had authorized him to remove the lines.

Mr. Bournias issued an ultimatum that Mr. Albertie either give Mr. Bournias $800 to replace the pipes or be fired. Mr. Mavromoustakos issued a similar ultimatum to Robert Miller, who was also working at the job site. Neither Mr. Albertie nor Mr. Miller paid the money, and they were both terminated. Mr. Miller was later rehired; he was told that defendants believed that Mr. Albertie was the "mastermind" to blame for the missing copper pipe.

Waldo Hatch, who managed the project at Teachers College, testified that he specifically told Mr. Bournias during a walkthrough of the project that only some steel pipe, and not the copper pipe, was to be removed. When Mr. Hatch discovered the copper pipe had been removed, he called Mr. Bournias to tell him, "You need to find out where it went . . . [Mr. Bournias] said I'll take care of it." Trial Tr. 123. Defendants rely on the fact that Mr. Albertie was fired in asking the court to find that Mr. Albertie disobeyed Mr. Bournias's instructions when he removed the copper pipe. In the absence of any evidence on this point from Mr. Bournias, however, Mr. Albertie's testimony is uncontested, and the defendants have not met

---

[8] While Robert Miller, a current Unlimited Mechanical employee who assisted with Mr. Albertie on the job, testified that he himself took and sold half the copper for scrap, and thus contradicted Mr. Albertie's testimony that Mr. Albertie put all the copper in the dumpster, he offered no testimony as to whether Mr. Bournias had authorized its removal.

their burden of proof; indeed, it is equally plausible that Mr. Albertie was fired because Mr. Bournias did not want to accept the responsibility for the removal of the pipes.

### 2. Mr. Kalloo's Work for the Angel Orensanz Foundation

Around the time Mr. Kalloo left Unlimited Mechanical, he began his own company named Air Mechanical of New York. Air Mechanical of New York performed three or four jobs with the Angel Orensanz Foundation, an organization for which Unlimited Mechanical had also performed work. Defendants proffered no contracts between Unlimited Mechanical and the foundation. Mr. Kalloo had no written employment agreement with Unlimited Mechanical, nor any other written agreement that he would not solicit work or compete with them.

Shortly after Mr. Kalloo left Unlimited Mechanical, Unlimited Mechanical's work with the foundation dwindled. Mr. Mavromoustakos suspected that Mr. Kalloo had performed work for the foundation, and called the foundation. At trial, Mr. Mavromoustakos was asked:

> Q: After your phone call to [the] Angel Orensanz [Foundation] did you ever get any additional work from Angel Orensanz?
>
> A: Never.
>
> Q: Did you find out why?
>
> A: Well, when I threatened to subpoena them to let me know why they let Kevin do work there and they said, listen, we're not going to allow it, just leave us out of it. I got married there so I didn't really want to cause too much turmoil so honestly I just let it go. [Trial Tr. 422-23.]

### CONCLUSIONS OF LAW

**Plaintiffs' Claims**

#### A. Burden of Proof

Plaintiffs must prove by a preponderance of the evidence that defendants did not adequately compensate employees as required by the FLSA and the NYLL. *See Solis v. SCA*

16

*Restaurant Corp.*, ___ F. Supp. 2d. ___, 2013 WL 1401396, *8 (E.D.N.Y. 2013) (FLSA only).[9]
When an employer has "inaccurate or inadequate" records, the plaintiff "has carried out his
burden if he proves that he has in fact performed work for which he was improperly
compensated and if he produces sufficient evidence to show the amount and extent of that work
as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.
680, 687 (1946). The employee's burden "is not high," so "it is possible for a plaintiff to meet
this burden through estimates based on his own recollection." *Kuebel v. Black & Decker Inc.*,
643 F.3d 352, 362 (2d Cir. 2011). There must be, however, "at least some credible evidence that
plaintiff performed overtime work." *Daniels v. 1710 Realty LLC*, 497 Fed. App'x. 137, 139 (2d
Cir. 2012); *accord Grochowski v. Phoenix Const.*, 318 F.3d 80 (2d Cir. 2003). Once an
employee satisfies his burden, the employer may rebut with "evidence of the precise amount of
work performed or with evidence to negative the reasonableness of the inference to be drawn
from the employee's evidence." *Anderson*, 328 U.S. at 687-88.

New York Labor Law mirrors the FLSA with regard to the burden of proof where an
employer has failed to keep proper employment records. N.Y. Lab. L. § 196-a (where an
employer fails "to keep adequate records . . . , the employer in violation shall bear the burden of
proving that the complaining employee was paid wages, benefits and wage supplements"); *see
also Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 332 (S.D.N.Y. 2005).

Defendants concede that they did not keep written records of overtime payments made.
Therefore, plaintiffs must prove that they have in fact performed work for which they were

---

[9] Plaintiffs request an adverse inference based on Mr. Bournias's failure to testify on the defense
case at trial. This request is denied. However, Mr. Bournias's failure to testify means that
certain evidence is undisputed—*e.g.*, that Mr. Bournias gave Mr. Mohammad a W-2 form in
2008 and directed his work during that time and that Mr. Bournias directed Mr. Albertie to
remove the copper piping from Teachers College.

improperly compensated, and they must produce sufficient evidence for the court to draw a "just and reasonable inference" as to the amount and extent of that work. *Anderson*, 328 U.S. at 687.

### B. Mr. Bournias is Individually Liable as an Employer Under the FLSA and the NYLL

The Amended Complaint names Mr. Bournias as a defendant in his individual capacity. The FLSA states only that an "'[e]mployer' includes any person acting directly or indirectly in the interests of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The statute does not further define "employer." Because the FLSA is to be "construed . . . liberally to apply to the furthest reaches consistent with congressional direction," *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (quotation marks omitted), the Second Circuit has determined that, under the statute, an employer may include an individual owner who exercises a sufficient level of operational control in the company's employment of employees. *Irizarry v. Catsimatidis*, 722 F.3d 99, 104-111 (2d Cir. 2013).

The Second Circuit has adopted an "economic realities" test to determine whether an individual manager or owner may be held liable under the FLSA. *Id.* at 104-05. Under that test, a court considers a "nonexclusive and overlapping set of factors," including: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records," as well as the totality of the circumstances. *Id.* at 105, 116 (quoting *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984). "The determination of an employment relationship does not depend on such isolated factors as where work is done or how compensation is divided but rather upon the circumstances of the whole activity." *Irizarry*, 722 F.3d at 104 (quotation and editing marks omitted).

18

The NYLL defines "employer" as "any person . . . employing any individual in any occupation, industry, trade, business or service." N.Y. Lab. L. § 190(3). While there may be slight differences between the definitions of "employer" under the FLSA and the NYLL, *Irizarry*, 722 F.3d at 117, the parties have not advanced any arguments, and, based on such differences, in any event, any difference would be immaterial to the facts of this case.

Mr. Bournias, the president and fifty percent owner of Unlimited Mechanical, oversaw its work, directed its employees on a daily basis, set workers' schedules, determined rates of pay, visited job sites, made deliveries, and performed most of the hiring and firing. He supervised Unlimited Mechanical's employees, monitored their hours worked, reviewed their payroll, and told them when and where to work. Mr. Bournias signed employees' paychecks and paid their overtime hours in cash. Under the facts of this case, Mr. Bournias is properly considered an employer under both the FLSA and the NYLL.

### C. Mr. Kalloo is an Employee Under the FLSA and the NYLL

Defendants' argument that Mr. Kalloo was an independent contractor, not an "employee," of Unlimited Mechanical under the FLSA and the NYLL is rejected.[10] In the eyes of the FLSA (and with numerous exceptions inapplicable here), an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e). "Employ" means is defined to "include[] to suffer or permit to work." *Id.* § 203(g).

While the same "economic realities" test determines whether an individual is an independent contractor or employee, the Second Circuit has highlighted a slightly different set of factors that may be relevant to answer this question. *Irizarry*, 722 F.3d at 105. "[T]o distinguish between independent contractors and employees," courts look to

---

[10] The parties stipulated that Mr. Albertie and Mr. Mohammad were employees.

(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Barfield v. NYC Health & Hosps. Corp.*, 537 F.3d 132, 141, 143 (2d Cir. 2008) (citation omitted).

The NYLL defines "employee" as "any person employed for hire by an employer in any employment." N.Y. Lab. L. § 190(2). The definition of "employed" under the NYLL is that a person is "permitted or suffered to work." *Id.* § 2(7). Again, any differences between the definition of "employee" under the FLSA and the NYLL would be immaterial under the facts of this case.

Mr. Mavromoustakos testified that Mr. Kalloo was an employee of Unlimited Mechanical. In addition to being subject to the management, supervision, and oversight of Mr. Bournias, as described above, Mr. Kalloo was directed to wear Unlimited Mechanical shirts, sweaters, and hats when on the job, and Unlimited Mechanical provided him with equipment and materials to do his work. Thus, defendants exercised great control over Mr. Kalloo. The parties have stipulated that Mr. Kalloo earned an hourly rate. He had no opportunity to profit or invest in Unlimited Mechanical. While Mr. Kalloo had special skills required for the work, he worked when and where defendants told him to work. Mr. Kalloo performed work for defendants for nearly two consecutive years, and his work as an HVAC mechanic was integral to defendants' HVAC systems services. That Mr. Kalloo received a 1099 form does not outweigh the other, more substantial aspects of his relationship with defendants. Thus, the totality of the circumstances demonstrates that defendants employed Mr. Kalloo under the FLSA and the NYLL.

20

**D. Defendants are Liable for Overtime Violations Under the FLSA for Mr. Kalloo**

Under the FLSA, all "'[p]eriods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked . . . .'" *Kuebel*, 643 F.3d at 359 (quoting 29 C.F.R. § 790.6(a)). Speaking broadly, two categories of work time are at issue in this case—time spent installing, servicing, or maintaining HVAC systems, and time spent returning from the job site to the shop at the direction, or at least the sufferance, of the defendants. Defendants do not dispute that the type of travel time testified to by plaintiffs—if believed—is compensable as travel time; they simply argue that no such non-compensated travel time occurred. *See, e.g., Hajny v. Best Roofing of New Jersey, Inc.*, 2011 WL 2493737, *2 (S.D.N.Y. 2011) (employee required to return to employer's premises after normal hours is entitled to compensation); *see also* 29 C.F.R. § 785.38. The same is true under the NYLL. *See Hajny*, 2011 WL 2493737, at *4.

The FLSA requires that employees who work more than forty hours in a workweek "receive[] compensation for his employment in excess of [forty] hours . . . at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). In addition, the FLSA sets forth a broad civil enforcement scheme, pursuant to which "[a]ny employer who violates the provisions of . . . section 207 of this title shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." *Id.* § 216(b).

In an action to recover unpaid overtime wages under the FLSA, a plaintiff must show that: "(1) he was an employee who was eligible for overtime ([i.e.,] not exempt from the Act's overtime pay requirements); and (2) that he actually worked overtime hours for which he was not compensated." *Hosking v. New World Mortg., Inc.*, 602 F.Supp.2d 441, 447 (E.D.N.Y. 2009).

Mr. Kalloo asserts FLSA claims for unpaid work in excess of forty hours as reflected on the "time in" and "time out" entries on his timesheets. Mr. Kalloo's testimony and his timesheets reflect that he often worked more than forty hours per week, and, as defendants did not keep records of overtime hours worked, there is no evidence to the contrary. In the weeks when he worked more than forty hours, sixty percent of the time he was paid at his straight time rate, and the rest of the time he received no pay for his excess hours. Thus, Mr. Kalloo often worked more than forty hours per week but was not properly compensated for that work.[11]

Mr. Kalloo also asserts FLSA claims for unpaid overtime based on his travel time when that time resulted in a work week in excess of forty hours. As the Findings of Fact above reflect, Mr. Kalloo returned to the shop at the end of the day approximately fifty percent of the time to drop off his paperwork to Mr. Bornias and discuss the work he had performed that day, although he ceased doing so during his last three months. None of this time was reflected on his timesheets, and indeed, Mr. Bournias told him that he would not be paid for travel time.

For these reasons, I conclude that defendants violated the FLSA when they failed to pay Mr. Kalloo the full overtime wages owed when he worked more than forty hours per week, and when he engaged in travel time that resulted in work weeks of more than forty hours.

### E. Defendants are Liable for Violations of the NYLL

New York Labor Law Section 198(3) entitles an employee to "recover full wages" in a civil action. The NYLL also requires employers to pay an overtime premium "at a wage rate of one and one-half times the employee's regular rate" for hours worked in excess of forty hours in a workweek. N.Y. Comp. Codes R. & Regs. tit. 12, § 142–2.2. An employee has a right to

---

[11] Defendants' argument that Mr. Kalloo and the other plaintiffs received the equivalent of net overtime compensation after withholdings is rejected as contrary to public policy; defendants admit that they did not withhold or pay taxes on overtime compensation.

22

recover unpaid overtime wages, liquidated damages, prejudgment interest, reasonable attorneys' fees, and costs. N.Y. Lab. L. § 198(1-a).

### 1. Defendants are Liable for Overtime Violations of the NYLL for Mr. Albertie and Mr. Mohammad

Mr. Albertie and Mr. Mohammad assert claims for unpaid work in excess of forty hours as reflected on the "time in" and "time out" entries on their timesheets under the NYLL. As with Mr. Kalloo, because I credited Mr. Albertie's and Mr. Mohammad's testimony that they worked hours in excess of forty for which they did not receive their overtime premium, therefore I conclude that defendants violated the NYLL by failing to pay Mr. Albertie and Mr. Mohammad proper overtime compensation for their work.

Mr. Albertie and Mr. Mohammed also seek unpaid overtime wages under the NYLL for uncompensated travel time. Again, the Findings of Fact above compel the conclusion that Mr. Albertie and Mr. Mohammad were not paid for travel time which resulted in work weeks of more than forty hours.

### 2. Defendants are Liable for NYLL Violations of Unpaid Wages for All Plaintiffs' Straight Time Travel Time

In addition, all three plaintiffs seek unpaid straight time wages under the NYLL for unpaid travel time during weeks in which they worked less than 40 hours. Although much of their unpaid travel time occurred in weeks where they worked more than forty hours, the timesheets and paystubs, as summarized in plaintiffs' damages' spreadsheet, demonstrate that there were occasions when the unpaid travel time occurred in weeks where they worked less than forty hours. Based on the facts found above, I conclude that defendants violated the NYLL by failing to pay straight time for travel time.

### 3. Defendants are Liable for NYLL Violations of Unpaid Wages for Mr. Kalloo's Last Two Weeks at Unlimited Mechanical

23

As reflected in the Findings of Fact above, it is undisputed that Mr. Kalloo was not paid for the last two weeks that he worked at Unlimited Mechanical. In those last two weeks, he worked forty hours during the first week and sixteen hours during the second. Therefore, defendants are liable under the NYLL for these unpaid wages.

## Calculation of Damages

Plaintiffs do not seek duplicative damages for their separate claims under the FLSA and the NYLL.

### A. Overtime Pay for Hours Worked

If an employer is determined to have violated the FLSA, an employee may recover unpaid overtime wages, liquidated damages in an amount equal to his unpaid wages, interest, reasonable attorneys' fees, and costs. 29 U.S.C. § 216(b). Under New York law, the same categories of damages are available. N.Y. Lab. L. § 198(1-a). Under the FLSA, prejudgment interest may not be awarded in addition to liquidated damages. *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988). Both awards are available under the NYLL, however, because pre-judgment interest and liquidated damages are not "functional equivalents," as NYLL liquidated damages are not punitive. *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999).

Once a plaintiff has proven a prima facie case, "the burden shifts to the employer, and if the employer fails to produce evidence of the 'precise amount of work performed' or evidence to 'negative the reasonableness of the inference to be drawn from the employee's evidence,'" then approximate damages may be awarded. *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) (quoting *Anderson*, 328 U.S. at 687-88). In FLSA cases, the damages need

not be proven with precision. *Anderson*, 328 U.S. at 688. Each defendant is jointly and severally liable for all back wages and liquidated damages owed under the Act.

Under both federal and state law, a plaintiff is entitled to overtime wages at a rate of 150 percent of his regular wages for any week in which he worked more than forty hours. 29 U.S.C. § 207(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.4. Plaintiffs have calculated that Mr. Kalloo is owed $8,868.75 in unpaid overtime wages based on 236.5 hours of overtime worked. Mr. Kalloo testified credibly that he was paid his straight time but not the overtime premium sixty percent of the time. Therefore, defendants are credited with payments of $3,547.50 ((236.5 multiplied by .6) multiplied by $25), and owe Mr. Kalloo the remaining $5,321.25 in unpaid overtime wages under the FLSA ($8,868.75 minus $3,547.50).

Applying the same type of calculations to Mr. Albertie, defendants owe him $9,190.80 in unpaid overtime wages based on 255.3 hours of overtime worked. Defendants paid him straight time wages half of the time he worked overtime. Applying a credit of $3,063.60 ((255.3 multiplied by .5) multiplied by $24), defendants therefore owe Mr. Albertie $6,127.20 in unpaid overtime wages under the NYLL ($9,190.80 minus $6,127.20).

With respect to Mr. Mohammad, he earned $15 per hour in straight time for the first six months, or 26 weeks, of his employment, and $18 per hour for the remaining 27 weeks. Therefore, defendants owe him $3,758.04 in unpaid overtime wages based on 151.9 hours of unpaid overtime between May 26, 2007 and June 1, 2008 ($22.50 multiplied by 74.4 hours [2.86 overtime hours per week multiplied by 26 weeks] plus $27 multiplied by 77.2 hours [2.86 overtime hours per week multiplied by 27 weeks]). Mr. Mohammad always received his straight time wages, so defendants are entitled to a credit of $2,505.60 ($15 multiplied by 74.4 hours plus

$18 multiplied by 77.2 hours). Therefore, defendants owe Mr. Mohammad $1,252.44 in unpaid overtime wages under the NYLL ($3,758.04 minus $2,505.60).

### B. Straight Time and Overtime Pay for Travel Time

In addition to the above, Mr. Kalloo has demonstrated he was not paid for some portion of his travel time when that time would have resulted in work weeks in excess of forty hours under the FLSA. He estimated that it took him one hour each day to return to the shop on average. Plaintiffs estimate that this would entitle him to approximately $10,537.50 in unpaid overtime wages for travel time. However, until his last three months at Unlimited Mechanical, Mr. Kalloo returned to the shop approximately fifty percent of the time. After that, Mr. Kalloo never returned to the shop after finishing the day at the job site. These claimed damages must therefore be reduced. Accordingly, Mr. Kalloo's damages first must be reduced by 12.5% to $9,220.31 ($10,537.50 multiplied by .875) to take into account the final three months (out of a total of twenty four months) in which he did not travel back to the shop. During this time, however, he returned to the shop only fifty percent of the time, which requires a further reduction to $4,610.16 ($9,220.31 multiplied by .5). Therefore, Mr. Kalloo is entitled to $4,610.16 in unpaid overtime travel time compensation under the FLSA.

Mr. Kalloo is also entitled to unpaid straight time travel time compensation under the NYLL. Plaintiffs calculate his unpaid straight time travel time at $4,075.00. The reductions noted above apply equally to this time, resulting in $1,782.81 ($4,075.00 multiplied by .875 multiplied by .5). And, unlike the other plaintiffs, the summary chart indicates a number of occasions on which Mr. Kalloo was paid for a forty hour week, but in fact worked fewer hours. Accordingly, a further reduction of twenty-five percent is warranted to account for those

occasions, for a total of $1,337.11 ($1,782.81 multiplied by .75). Mr. Kalloo is entitled to $1,337.11 in unpaid straight time travel time under the NYLL.

With respect to Mr. Albertie, he returned to the shop nearly every day, and he spent an hour a day on average doing so. Plaintiffs calculate his unpaid wages for straight time and overtime travel at $11,904, but reduce that amount by ten percent to account for the occasions when he did not have unpaid travel or when he was not required to go to the shop. Therefore, Mr. Albertie is entitled to $10,713.60 in unpaid straight time and overtime travel time under the NYLL.

Regarding Mr. Mohammad, plaintiffs calculate Mr. Mohammad's damages on this issue at $13,465.71 based on a daily return travel time of one hour. However, it was established at trial that he worked in the shop for two months out of twelve, so a reduction of seventeen percent to $11,176.54 is warranted. And, since he testified that he only returned to the shop "three or four" days per week, a further reduction of thirty percent to $7,823.58 is warranted. Therefore, Mr. Mohammad is entitled to $7,823.58 in unpaid straight time and overtime travel time under the NYLL.

### C. Straight Time For Hours Worked

As discussed above Mr. Kalloo is entitled to $1,400 under the NYLL for his last two weeks of unpaid work at Unlimited Mechanical. ($25 multiplied by 56 hrs).[12]

### D. Liquidated Damages

Both federal and state law provide for an award of liquidated damages to a plaintiff who has established that an employer failed to pay required wages. *Siemieniewicz*, 2012 WL

---

[12] Plaintiffs appear to seek an additional $300 for Mr. Albertie and $600 for Mr. Kalloo for unpaid straight time hour for hours worked. No testimony was offered at trial to support these damages claims.

5183375, at *12. Under the FLSA, an employer who violates the federal overtime provisions is liable for liquidated damages equal to one hundred percent of the amount of compensatory damages where the employer's actions were not taken in good faith. 29 U.S.C. § 260. To avoid liquidated damages, the employer bears the burden of establishing that "the act or omission giving rise to such action was in good faith and that he had reasonable ground for believing that his act or omission was not a violation" of the FLSA. 29 U.S.C. § 260 (2006). *See Reich*, 121 F.3d at 70-71. The employer's "burden is a difficult one, with double damages being the norm and single damages the exception." *Herman V. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).

Defendants have failed to demonstrate that their failure to properly pay overtime wages was in good faith. Defendants did not employ a reliable system to accurately track all overtime hours worked by plaintiffs. In determining how much to pay for overtime worked, defendants relied on Mr. Bournias's memory and his discretion. Defendants "recorded" overtime payments on scraps of paper which they then discarded. Liquidated damages under the FLSA are appropriate, and are awarded to Mr. Kalloo in the amount of $9,931.41 ($5,321.25 plus $4,610.16).

For violations of the NYLL prior to November 24, 2009, liquidated damages are available only if the employer's underpayments were willful, and "the burden is on the plaintiff to prove willfulness in order to obtain liquidated damages under New York law." *Gortat v. Capala Bros.*, ___ F. Supp. 2d ___, 2013 WL 2566622, at *4 (E.D.N.Y. 2013) (quotation marks omitted). "The applicable test for willfulness in [the NYLL] context appears to parallel that employed in determining willfulness for limitations purposes under the FLSA." *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 261 (S.D.N.Y. 2008). On November 24, 2009, an

amendment to the NYLL removed the prior willfulness requirement and placed the burden on employers to avoid liquidated damages by demonstrating good faith. *See Chenensky v. N.Y. Life Ins. Co.*, 2012 WL 234374, at \*2 (S.D.N.Y. 2012).

For NYLL claims arising prior to April 9, 2011, the liquidated damages provision provides for an award of twenty-five percent of the wages owed, including unpaid wages and unpaid overtime. N.Y. Lab. L. § 198(1–a) (amended 2010). On April 9, 2011, the NYLL was amended to provide that employers who violate the NYLL are liable for one hundred percent of wages owed unless they demonstrate good faith. N.Y. Lab. L. § 198(1–a).

For the reasons discussed above, plaintiffs have demonstrated that defendants have willfully failed to pay overtime owing to them. In addition, plaintiffs have demonstrated that defendants failed to properly pay straight time wages for travel time. For example, Mr. Albertie and Mr. Mohammad testified that Mr. Bournias told them the times they should record on their timesheets, and those times did not reflect travel time. In addition, Mr. Kalloo testified that Mr. Bournias told him that he did not pay for travel time, and it is fair to infer that this practice was consistent throughout the time plaintiffs worked at Unlimited Mechanical.

As stated above, Mr. Kalloo is entitled to \$2,737.11 (\$1,400 plus \$1,337.11) in damages under the NYLL. Of that amount, approximately \$1,083.06 (\$1,337.11 multiplied by .81 [17 months out of 21 months]) was incurred before April 9, 2011, and thus is subject to a liquidated damages award of twenty-five percent, or \$270.76, under the NYLL. The remaining \$1,654.05 (\$1,400 plus \$254.05 [\$1,337.11 multiplied by .19 [4 months out of 21 months]]) was incurred after April 9, 2011, and thus is subject to a liquidated damages award of one hundred percent, or \$1,654.05. Mr. Kalloo is therefore awarded total liquidated damages under the NYLL in the amount of \$1,924.81. Mr. Albertie is awarded liquidated damages under the NYLL in the

amount of $4,210.20 (($6,127.20 plus $10,713.60) multiplied by .25). Mr. Mohammad is awarded liquidated damages under the NYLL in the amount of $2,269.01 (($1,252.44 plus $7,823.58) multiplied by .25).

### E. Prejudgment Interest Under the NYLL

The statutory rate of interest is nine percent per year. N.Y. C.P.L.R. § 5004. When damages were incurred over a period of time, interest may be calculated from "the date [damages were] incurred or upon all of the damages from a single reasonable intermediate date." *Id.* § 5001(b). Plaintiffs have calculated the midpoint of Mr. Kalloo's employment as November 23, 2010, which is a reasonable intermediate date. Likewise, the midpoint of Mr. Albertie's employment is December 8, 2007, and the midpoint of Mr. Mohammad's employment is November 28, 2007.

## Counterclaims

Defendants must prove their counterclaims by a preponderance of the evidence.

### A. Claim Against Mr. Albertie

Defendants seek repayment under a theory of "unjust enrichment" of $15,000 of costs incurred to replace copper piping that Mr. Albertie allegedly took from Teachers College. To prevail on their unjust enrichment claim, defendants must establish that Mr. Albertie benefitted at their expense and that "equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quotations omitted). The "essence" of the claim "is that one party has received money or a benefit at the expense of another." *Kaye*, 202 F.3d at 616 (quotations omitted). Since the defendants did not prove their case, and the evidence established that Mr. Bournias directed Mr. Albertie to remove the copper piping, defendants have failed to

30

demonstrate that equity and good conscience require restitution here. Thus, this counterclaim fails.

### B. Claims Against Mr. Kalloo

Defendants have asserted counterclaims against Mr. Kalloo for interference with contractual relations as well as interference with business relations. They seek loss of monthly maintenance business with the Angel Orensanz Foundation.

The parties agree on the elements of the counterclaims. In New York, a claim for tortious interference with a contractual relation requires: (1) the existence of a contract between the plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach; and (4) damages. *Foster v. Churchill*, 87 N.Y.2d 744, 749-50 (1996). Unlimited Mechanical offered no evidence it had a contract with the foundation at the time of the alleged wrongful interference.

A claim for tortious interference with business relations in New York requires that: (1) the defendant knew of the proposed business relations between the plaintiff and the third party; (2) the defendant intentionally interfered with the proposed business relations; (3) the parties would have entered into the proposed business relations but for defendant's interference; (4) the defendant's interference was done in a wrongful manner; and (5) plaintiff sustained damages. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004). Interference with business relations is done in a "wrongful manner" when the conduct amounts to a crime or an independent tort (such as physical violence, fraud, or misrepresentation) or is done for the sole purpose of inflicting intentional harm on the plaintiff. *Id.* at 190 (reserving the question of whether other "egregious conduct" of extreme or unfair economic pressure could demonstrate sufficient culpability). There is no evidence demonstrating that Mr. Kalloo engaged in conduct that could constitute a

"wrongful manner." Moreover, it is undisputed that Mr. Mavromoustakos threatened to subpoena documents from the foundation. It is fair to infer based on his testimony that this threat is the reason Unlimited Mechanical did no further work for the foundation. Defendants' counterclaims against Mr. Kalloo are therefore unproved.

## CONCLUSION

For the reasons discussed above, Mr. Kalloo is awarded $9,931.41 in unpaid overtime wages and travel time (overtime) under the FLSA, $9,931.41 in liquidated damages under the FLSA, $2,737.11 in unpaid straight time wages and travel time under the NYLL, and $1,924.81 in liquidated damages under the NYLL. Prejudgment interest on the NYLL claims of nine percent on the principal amount of $2,737.11 accrues from November 23, 2010, through the date of the entry of Judgment.

Mr. Albertie is awarded in $16,840.80 in unpaid overtime and travel time (straight time and overtime) and $4,210.20 in liquidated damages under the NYLL. Prejudgment interest on the NYLL claims of nine percent on the principal amount of $16,840.80 accrues from December 8, 2007, through the date of the entry of Judgment.

Mr. Mohammad is awarded in $9,076.02 in unpaid overtime and travel time (straight time and overtime) and $2,269.01 in liquidated damages under the NYLL. Prejudgment interest on the NYLL claims of nine percent on the principal amount of $9,076.02 accrues from November 28, 2007, through the date of the entry of Judgment .

The parties agree that plaintiffs' award of straight time and overtime wages will be processed via defendants' payroll system, and defendants shall file an affidavit certifying that federal and state taxes were properly withheld within thirty days of the date of entry of the Judgment.

Defendants' counterclaims have not been proven.

The Clerk of Court is directed to enter Judgment for plaintiffs and against the defendants jointly and severally on their claims as indicated above, including the calculation of prejudgment interest as described above, and in favor of plaintiffs on the defendants' counterclaims.

Plaintiffs are directed to file any application for attorneys' fees and costs within fourteen days of the date of this Opinion. Defendants shall file any opposition within twenty-eight days of the date of this Opinion, and plaintiffs shall file any reply within seven days.

**SO ORDERED.**

s/Nina Gershon

**NINA GERSHON**
**United States District Judge**

Dated: October 10, 2013
Brooklyn, New York